IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LON LEWIS,<br><br>    Plaintiff,<br><br>vs.<br><br>DRAPER CITY,<br><br>    Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:09-CV-589 TC |

  Plaintiff Lon Lewis alleges that Defendant Draper City violated the Federal Fair Housing Act when it denied Mr. Lewis's application to build a 14,000 square foot group home for 24 elderly disabled residents in an area of Draper City zoned for single-family homes. Under Draper City's Ordinance 838 (the "Ordinance"), facilities for the disabled cannot have more than eight residents. Mr. Lewis alleges that the Ordinance impermissibly discriminates against disabled people, and that Mr. Lewis's request for an accommodation from the Ordinance should have been granted.

  In cross motions for partial summary judgment, both Mr. Lewis and Draper City have asked the court to decide whether, in violation of the Federal Fair Housing Act, Draper City failed to grant a reasonable accommodation from the Ordinance to permit construction of the proposed group home. Accordingly, for the purpose of this order, the court assumes, without deciding, that the Ordinance itself does not violate the Federal Fair Housing Act.

**BACKGROUND**

On February 27, 2009, Mr. Lewis submitted an application to the Draper City Zoning Administrator for an accommodation from the Ordinance's eight-occupant limit for group homes for the disabled. The application includes a letter from Mr. Lewis's attorney, Richard G. Allen, in which Mr. Allen writes that "[t]here are no residential facilities for persons with disabilities in Draper City at this time . . . ." (Lewis Application at 3 (attached as Am. Ex. A to Plaintiff's Mem. Supp. Mot. Summ. J.)), and that the requested accommodation would "allow persons with disabilities to reside in residential areas of their choosing in Draper City." (Id. at 2.)

Mr. Allen explained in the letter:

> The proposed facility will be built to accommodate 24 persons with disabilities. However, the financial analysis was done based on usual vacancy rates that would result in the average number of disabled residents being 22. The facility will provide 24 hour supervision with a normal staff number of four during the day and two staff at night. The expected number of visitors is hard to determine but a total of five visitors each day is a best estimate.

(Id. at 5.) Mr. Allen continued:

> The [plans enclosed with Mr. Lewis's application] show that the proposed building will look like a large home. The facility will not generate sufficient traffic or require sufficient additional parking to impact the residential character of the facility or the immediate neighborhood. The immediate neighborhood is comprised of a few larger homes, some of which are used for commercial operations, an empty field and a commercial agricultural operation. Therefore, the proposed residential facility will not negatively impact the character of the immediate neighborhood. . . . <u>The proposed facility is designed so that it meets all of the requirements for approval as a single family residence.</u> The building looks and functions the same as a large single family home. The residents will live like most other families. The residents will eat together and will rely on each other for social activities and succor. None of the residents will drive so the facility will not create any significant traffic or parking problems.

(Id. at 6, 7 (emphasis added).)

2

Mr. Allen explained in the letter that the requested variance was necessary to make the project financially feasible:

> The construction of the proposed residential facility for persons with disabilities will require bank financing. Mr. Lewis has an established relationship with Central Bank for the financing of such facilities. In order to obtain financing for the proposed residential treatment facility on the Subject Property, Mr. Lewis obtained an appraisal of the proposed facility on the Subject Property in 2008. That appraisal was prepared by Jorgenson Appraisal and is dated July 7, 2008. Based on that appraisal and Mr. Lewis' revenue and costs projections for such a facility, Central Bank has determined that the smallest residential facility for persons with disabilities on the Subject Property that could qualify for a loan from Central Bank is one with room for 24 occupants. Projections for smaller facilities indicate that they will not meet the ratio of annual net operating income to the annual costs to service the loan required by Central Bank.

(Id. at 2.)

Also included in the application was a letter from Mark C. Van Wagoner, Senior Vice President/Manager of Central Bank, in which Mr. Van Wagoner states:

> It appears from the Income analysis and other information set out in the Appraisal Report prepared by Jorgensen Appraisal dated July 7, 2008, and your revenue and operating cost projections, that a residential facility for persons with disabilities with less than 24 occupants will not meet Central Bank's requirements of net operating revenue to costs of debt service and therefore will not qualify for financing from Central Bank. . . . The above information indicates that while smaller facilities for persons with disabilities will require smaller loans, the projected net operating revenue from the smaller sized facilities will not meet the required ratio or annual net operating revenue to annual payments for the proposed facility."

(Id. at 10.)

On March 23, 2009, Draper City Zoning Administrator Andy Hall issued a decision denying Mr. Lewis's request. Mr. Hall interpreted City of Edmonds v. Oxford House, Inc., 514 U.S. 725 (1995) to exempt Draper City's eight-person limitation from the Fair Housing Act. (See Zoning Administrator Decision at 2 (attached as Ex. C to Defendant's Mem. Supp. Mot. Summ. J.).)

Under the heading, "Economic Considerations," the decision reads:

> The evidence to support the need for additional occupants based on economic considerations raises some concern. It has been indicated that an appraisal of the proposed facility was completed (July 7, 2008) and Central Bank has determined that qualification for a loan would require no less than twenty four (24) occupants. It is quite plausible that Central Bank reached this conclusion based on the size of the proposed structure (14,190 square feet) which is much larger than a structure needed for eight (8) occupants. Further, their determination was based on Mr. Lewis' revenue and cost projections which were "based on usual vacancy rates that would result in the average number of disabled residents being 22. The facility will provide 24 hour supervision with a normal staff number of four during the day and two staff at night."

(Id. at 2-3.) Mr. Hall alludes to other problems with the proposed group home, but implies that a thorough review of the proposal is not necessary because the proposal is inconsistent with the Ordinance's limitation:

> Beyond the obvious inconsistency with the occupancy limitations, the proposed structure would violate several basic provisions of the Land Use Ordinance including access, setbacks, lot coverage and potentially other regulations <u>which would be discovered upon a complete review of the proposal.</u>

(Id. at 3 (emphasis added).)

Mr. Hall also writes: 1) "The character of this specific neighborhood does not include structures of approximately 14,000 square feet <u>of a non-residential nature</u>." (Id. at 2 (emphasis added).) 2) "The application involves a substantial enlargement of the existing dwelling in a manner inconsistent with the provisions of the zoning regulations." (Id. at 3.) 3) "A non-disabled person would not be allowed to construct the structure as proposed and thus equal results would not occur [were the city to grant the accommodation]." (Id.) And 4) "It would be inconsistent with the very essence of the zoning regulations to place a commercial structure in a residential zone." (Id. at 4.)

4

On April 6, 2009, Mr. Lewis appealed the city's decision with a letter from Mr. Allen. In the appeal letter, Mr. Allen explained why the Ordinance is covered by the Fair Housing Act. (See Apr. 6, 2009 Appeal Letter at 2-3 (attached as Ex. C to Plaintiff's Mem. Supp. Mot. Summ. J.).) He also responded to the city's concerns regarding the financial information included in the original request:

> Applicant did provide Central Bank with analyses of the estimated costs to construct facilities and the projected profit and loss from operating residential facilities for elderly disabled persons for an eight person facility and for 18, 20 and 22 person facilities. The operating revenues for the smaller facilities were either negative or were not sufficient to meet the ratio required by Central Bank of annual net operating income to the annual costs to service the loan. If you desire to review those analyses, they will be provided to you.

(Id. at 4.)

On May 5, 2009, the city held a variance and appeals hearing, for which it kept detailed minutes. The minutes of the meeting reflect the following comment made by Mr. Hall, who represented the city at the meeting:

> When you read through the Federal Fair Housing and look up the information on reasonable accommodation, reasonable accommodation is primarily geared to physical elements of a structure such as stairs, handicapped ramps, and other physical limitations for a person with a disability. The reasonable accommodation that we are discussing in this hearing is a reasonable accommodation section that Draper City has in its ordinance. If you go to federal statutes, you may get a different definition. . . . [T]he staff is simply charged with following the ordinance the way it was adopted. It is adopted, the council determined that eight is the appropriate number, and staff is obligated to follow that number.

(Minutes of May 5, 2009, Variance and Appeals Hearing at ¶ 1.13 (attached as Ex. F to Plaintiff's Mem. Supp. Mot. Summ. J.) (emphasis added).) Mr. Hall also said that "Draper City does not review or consider the financial viability of a business; it is not practical for a city to create land use regulations based on whether a business is economically viable." (Id. at ¶ 1.2.)

5

On May 18, 2009, Draper City Appeals and Variance Hearing Officer Gary M. Jones issued a decision upholding Mr. Hall's earlier denial of Mr. Lewis's request.[1] Mr. Jones writes:

> The contention that the municipality must assure the financial feasibility of the project and provide reasonable accommodation based on a minimum level of occupancy is inconsistent with good public policy and would compromise the express purpose of the Ordinance to regulate land use standards in the best interest of the community. This assumption would set a dangerous precedent and undermine the integrity of other types of land use regulations including commercial and residential development based on financial considerations rather than good planning practices.

(Notice of Appeal Decision at 1 (attached as Ex. G to Plaintiff's Mem. Supp. Mot. Summ. J.).)

Seven weeks later, Mr. Lewis filed a complaint in this court alleging that Draper City had violated the Federal Fair Housing Act.

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c). "Congress did not intend the federal courts to act as zoning boards by deciding fact-intensive accommodation issues in the first instance." Keys Youth Servs., Inc. v. City of Olathe, Kansas, 248 F.3d 1267, 1275-76 (10th Cir. 2001) (quoting Oxford House-A v. City of Univ. City, 87 F.3d 1022, 1025 (8th Cir. 1996)). Accordingly, in deciding whether Draper City should have granted a reasonable accommodation, the court confines its review to the administrative record, which reflects the arguments advanced by Mr. Lewis and the information available to Draper City when it denied

---

[1] The May 18, 2009, decision refers Mr. Lewis to the minutes of the May 7, 2009, meeting.

Mr. Lewis's request.[2,3]

**ANALYSIS**

Under the Fair Housing Act, it is unlawful for Draper City "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person . . . intending to reside in that dwelling after it is so sold, rented, or made available . . . ." 42 U.S.C. § 3604(f)(1)(B). "[D]iscrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling . . . ." 42 U.S.C. § 3604(f)(3)(B). The Fair Housing Act "imposes an affirmative duty to reasonably accommodate handicapped persons." City of Edmonds v. Washington State Bldg. Code Council, 18 F.3d 802, 806 (9th Cir. 1994), aff'd 514 U.S. 725 (1995).

As Draper City has acknowledged in its pleadings in this case and during oral argument on the cross motions for summary judgment, the Ordinance is <u>not exempt</u> from the Fair Housing Act.[4] In other words, the city had an obligation to grant Mr. Lewis's request if that request was

---

[2] The court uses the record of Mr. Lewis's appeal to Draper City to better understand the bases for the city's initial determination. Additional information presented to the city on appeal is considered only to the extent that that information was also available to the city during its initial review.

[3] There is no dispute regarding the authenticity of the documents that make up the administrative record.

[4] A rule that "cap[s] the total number of occupants in order to prevent overcrowding of a dwelling" is exempt from the Fair Housing Act. City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 735 (1995). The Ordinance, on the other hand, prohibits Mr. Lewis from constructing any home that would accommodate 24 residents, regardless of size.

both 1) necessary to afford the elderly disabled who might want to live in a residential neighborhood in Draper City an equal opportunity to do so, and 2) reasonable.

The court assumes, without deciding, that Mr. Lewis had the initial burden to prove the accommodation he requested was both necessary and reasonable. Mr. Lewis provided evidence that the size of his proposed group home was necessary to make the project economically feasible. If an applicant for an accommodation from a maximum-occupant limitation shows that an increased number of residents is necessary for a facility for disabled residents to be financially successful, the requested accommodation is necessary. See, e.g., Keys Youth Servs., Inc. v. City of Olathe, Kansas, 248 F.3d 1267, 1275 (10th Cir. 2001).

Mr. Lewis's proposal also indicated that the accommodation was reasonable. According to Mr. Lewis, the more than 30 pages of plans he provided with his initial application, including a site plan, elevation drawing, and floor plan for the proposed facility (see Plaintiff's Mem. Supp. Mot. Summ. J. at 6 n.3; 8) show that the proposed group home would look like a single-family residence. And Mr. Allen's description of the group home indicates that it would function much like a single-family residence. In fact, according to Mr. Allen, the proposed facility would meet all of the requirements for approval as a single-family residence.

Despite the city's affirmative duty to reasonably accommodate handicapped people, Draper City Zoning Administrator Andy Hall (applying an incorrect standard unrelated to the mandates of the Fair Housing Act) denied Mr. Lewis's request without any evidence that the request was either unnecessary or unreasonable.

Mr. Hall had no basis to question the financial analyses performed by Mr. Lewis or Central Bank. Mr. Hall did not ask to review Mr. Lewis's or Central Bank's underlying

assumptions or calculations. And there is no evidence in the record that the city performed its own financial analysis.

Mr. Hall did not identify any specific requirement for approval as a single-family residence that would not be met by the proposed group home; instead, he admits that he did not carefully review the plans. Mr. Hall did not commission any studies regarding the character of the surrounding neighborhood or the impact the proposed group home would have on traffic or parking. In fact, Mr. Hall did not articulate any reason that the proposed group home would negatively impact the neighborhood, except that it would be "commercial" and that it would be substantially larger than the existing structure.[5]

Of course, the elderly disabled who want to live in a residential neighborhood may have no choice but to live in a "commercial" home; a residential group home is fundamentally residential in character. See, e.g., Groome Res. Ltd. v. Parish of Jefferson, 234 F.3d 192, 201-02 (5th Cir. 2000) ("Congress found that these seemingly 'neutral rules and regulations,' even those involving commercial/noncommercial zoning distinctions, nonetheless had a discriminatory effect on the housing choices available for the disabled. . . . Primarily, the discriminatory effect recognized by Congress resulted from the fact that the disabled were not able to live safely and independently without organized, and sometimes commercial, group homes . . . ."). Further, Draper City does not deny that a "residential facility for persons with a disability" is a permitted use in any residential zone in Draper City. (See Defendant's Mem. Opp'n Mot. Summ. J.; Undisputed Fact 5, Plaintiff's Mem. Supp. Mot. Summ. J. at 7.)

---

[5] Similarly, the record of Mr. Lewis's appeal includes few if any facts that would lend <u>any</u> support to a finding that Mr. Lewis's request was either not necessary or not reasonable.

Although Mr. Hall writes that the existing dwelling is "similar in size and scale with other properties in the area," and that the proposed group home would "involve[] a substantial enlargement of the existing dwelling" (Zoning Administrator Decision at 3 (attached as Ex. C to Defendant's Mem. Supp. Mot. Summ. J.)), Mr. Hall did not identify the size of any of the surrounding buildings or explain why a larger home would require a fundamental alteration in the nature of the zoning program. That a proposed group home would be substantially larger than both the existing structure it would replace and "other properties in the area," does not, standing alone, render the proposal not reasonable.[6]

## ORDER

For the foregoing reasons, the court concludes that Draper City violated the Federal Fair Housing Act by failing to provide a reasonable accommodation for the elderly disabled who might want to live in a residential neighborhood in Draper City, but need the assistance provided by a group home. Mr. Lewis's motion for partial summary judgment (Dkt. No. 11) is granted and Draper City's motion for partial summary judgment (Dkt. No. 12) is denied.

SO ORDERED this 21st day of September, 2010.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge

---

[6] This is especially true, where, as here, the city has not imposed any size limit for single-family homes built in the same residential zone.